**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | |
|---|---|
| AWT BE GOOD LLC | CIVIL ACTION NO. 16-1412 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| CHESAPEAKE LOUISIANA, L.P., ET AL. | MAGISTRATE JUDGE HAYES |

**MEMORANDUM RULING**

Before the Court are multiple pending motions filed by the parties pursuant to Federal Rule of Civil Procedure 56: (1) Plaintiff AWT Be Good LLC's ("AWT") Motion for Partial Summary Judgment (Record Document 45); (2) Defendants Chesapeake Louisiana, L.P. ("CLLP"), Chesapeake Operating, L.L.C. ("COLLC"), and Chesapeake Energy Marketing, L.L.C.'s ("CEM") (collectively "Chesapeake") Motion for Summary Judgment (Record Document 47); and (3) Defendant PXP Louisiana L.L.C.'s ("PXP") Motion for Summary Judgment (Record Document 49). Chesapeake and PXP oppose AWT's motion; AWT likewise opposes Chesapeake and PXP's respective motions. For the reasons set forth below, all motions are **DENIED**.

**I.   BACKGROUND**

This oil and gas case concerns the parties' conflicting interpretations of certain provisions contained in a mineral lease. On March 25, 2008, AWT entered into an oil and gas lease (the "Lease") with Meagher Oil and Gas Properties, Inc. covering property located in DeSoto and Red River Parishes, Louisiana. See Record Document 47-2 at 1.[1]

---

[1] Because AWT has not controverted the majority of Chesapeake's Statement of Uncontested Material Facts as required by Local Rules 56.1 and 56.2 (and instead primarily asserts legal conclusions in response to it), much of the background section of

The Lease was later assigned to Chesapeake on August 15, 2008. See id.; Record Document 45-1 at 1. Thereafter, Chesapeake subleased a 20% interest in the Lease to PXP (the "Sublease"). See Record Document 45-1 at 1.

Two years later on August 18, 2010, AWT and Chesapeake entered into an amendment of the Lease (the "Lease Amendment"), the interpretation of which is the primary basis for the instant dispute, to provide as follows:

> 12. TRANSPORTATION CHARGES: With regard to mineral production, <u>LESSEE bears all costs</u> of production, <u>transportation</u>, gathering, compression, disposal of salt water and any other cost, expense or preparation necessary to produce, process <u>and/or transport</u> the mineral production, except with regard to gas, LESSEE shall pay all of said costs including any other costs and expenses that are incurred prior to delivery of the gas into a regulated intrastate pipeline or interstate gas pipeline at the tailgate of the furthest downstream of <u>either</u> (i) a gathering system; <u>or</u> (ii) a treating plant, for delivery to its final market destination (a "Transportation Pipeline"). <u>It is the intention of the parties that with regard to gas, the only cost that the Lessor's royalty shall bear is its proportionate share of the long-haul transportation charges to the point of sale of the royalty gas once the gas is in a Transportation Pipeline</u>. Royalty will be paid on any mineral production produced from any well, even minerals that are used to operate and/or service any equipment used in the production, compression, processing or transportation of said mineral production, except for shrinkage and fuel lost and unaccounted for incurred after delivery into the Transportation Pipeline.

Record Document 45-2 at 6 (emphasis added). AWT alleges that Chesapeake, in direct violation of the Lease Amendment, has been and continues to improperly deduct from AWT's royalties what it alleges are "unused" "capacity charges," costs which AWT contends are not associated with the "actual" transportation of AWT's gas. See id. at 5–6.

---

the instant Memorandum Ruling is drawn from that document. See Record Document 58-4; Record Document 47-2.

As explained by AWT, these capacity charges incurred by Chesapeake are "upfront reservation fee[s] a gas producer pays to a pipeline owner in order to secure future space in the pipeline for the delivery of its gas to distant markets." See id. at 6–7 (quoting Commissioner of General Land Office of State v. SandRidge Energy, Inc., 454 S.W.3d 603, 621 (Tex. App.–El Paso 2014)). AWT further explains these charges as a type of "take-or-pay" obligation that producers, like Chesapeake, agree to pay to third-party transportation pipelines each month to transport a certain volume of gas, whether or not the producer actually ships the reserved volume. See id. According to AWT, Chesapeake incurs these costs (and subsequently charges them against AWT's royalties) not only when it ships a volume of AWT's gas that is below the reserved volume but also when no amount of AWT's gas is shipped in the pipeline. See id. Chesapeake responds that the capacity charges are actual transportation costs that are a customary practice in the oil and gas industry and are necessary to ship the gas to additional downstream markets in order to maximize revenue. See Record Document 47-1 at 7–8. Chesapeake also maintains that, contrary to AWT's assertion, capacity charges (or reservation fees) are not netted in computing AWT's royalty if none of AWT's gas is shipped in a pipeline that has a reservation fee. See id. at 11.

Beginning on October 13, 2015, AWT first sent notice to Chesapeake of an alleged underpayment of royalties. See Record Document 47-2 at 4. Chesapeake responded to this notice by issuing a royalty check to AWT which, according to Chesapeake, included reimbursement to AWT for gathering and associated fuel costs that Chesapeake had mistakenly charged to AWT in computing its royalties. See id. The following year, Chesapeake received additional notices for failure to properly pay royalties from AWT's

As explained by AWT, these capacity charges incurred by Chesapeake are "upfront reservation fee[s] a gas producer pays to a pipeline owner in order to secure future space in the pipeline for the delivery of its gas to distant markets." See id. at 6–7 (quoting Commissioner of General Land Office of State v. SandRidge Energy, Inc., 454 S.W.3d 603, 621 (Tex. App.–El Paso 2014)). AWT further explains these charges as a type of "take-or-pay" obligation that producers, like Chesapeake, agree to pay to third-party transportation pipelines each month to transport a certain volume of gas, whether or not the producer actually ships the reserved volume. See id. According to AWT, Chesapeake incurs these costs (and subsequently charges them against AWT's royalties) not only when it ships a volume of AWT's gas that is below the reserved volume but also when no amount of AWT's gas is shipped in the pipeline. See id. Chesapeake responds that the capacity charges are actual transportation costs that are a customary practice in the oil and gas industry and are necessary to ship the gas to additional downstream markets in order to maximize revenue. See Record Document 47-1 at 7–8. Chesapeake also maintains that, contrary to AWT's assertion, capacity charges (or reservation fees) are not netted in computing AWT's royalty if none of AWT's gas is shipped in a pipeline that has a reservation fee. See id. at 11.

Beginning on October 13, 2015, AWT first sent notice to Chesapeake of an alleged underpayment of royalties. See Record Document 47-2 at 4. Chesapeake responded to this notice by issuing a royalty check to AWT which, according to Chesapeake, included reimbursement to AWT for gathering and associated fuel costs that Chesapeake had mistakenly charged to AWT in computing its royalties. See id. The following year, Chesapeake received additional notices for failure to properly pay royalties from AWT's

counsel, to which Chesapeake responded that AWT's royalties were being calculated and paid properly. See id. at 5.

On September 7, 2016, AWT filed an Original Petition for Proper Payment of Royalties Plus Damages and Attorney's Fees (the "Petition"), which was subsequently removed to this Court, alleging various claims against Chesapeake regarding its computation and payment of AWT's royalties. See Record Document 1-2 at 1, 19–20. AWT seeks from this Court an order against Chesapeake declaring that the disputed Lease Amendment prohibits Chesapeake from charging AWT's royalties with certain transportation-related post-production costs. See Record Document 45-2 at 5. In response, Chesapeake also requests summary judgment in its favor, not only as to whether such transportation costs are properly deductible, but also as to the other claims AWT alleges in its Petition. See Record Document 47 at 1. Additionally, PXP requests summary judgment dismissing all of AWT's claims against it or, in the alternative, joins in Chesapeake's motion for the same relief. See Record Document 49-1 at 6.

## II. LAW AND ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010).[2] A genuine dispute of material fact exists if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party.

---

[2] The Court notes that amended Rule 56 requires that there be "no genuine dispute as to any material fact," but this change does not alter the court's analysis. F.R.C.P. 56(a) and advisory committee's note (2010) (emphasis added).

See Geoscan, Inc. of Texas v. Geotrace Techs., Inc., 226 F.3d 387, 390 (5th Cir. 2000). During this stage, courts must look to the substantive law underlying the lawsuit in order to identify which facts are "material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof [at trial]." See Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986)). If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine [dispute] for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005).

In reviewing a motion for summary judgment, the court is to view "the facts and inferences to be drawn therefrom in the light most favorable to the non-moving party." Tubos de Acero de Mexico, S.A. v. Am. Int'l Inv. Corp., Inc., 292 F.3d 471, 478 (5th Cir. 2002); Harris v. Serpas, 745 F.3d 767, 771 (5th Cir. 2014). The court should not, however, in the absence of any proof, presume that the nonmoving party could or would prove the necessary facts. See Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).

As the present case is before the Court under diversity jurisdiction, the Court must apply the substantive law of the forum state pursuant to the Erie doctrine. Bradley v.

Allstate Ins. Co., 620 F.3d 509, 517 n.2 (5th Cir. 2010) (citing Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817 (1938)). Here, because the Lease covers immovable property situated in Louisiana, it is undisputed that Louisiana substantive law controls. See Arctic Slope Regional Corp. v. Affiliated FM Ins. Co., No. 07-0476, 2007 WL 4545894, at *2 (W.D. La. Dec. 18, 2007).

### B. Interpretation of the Lease Amendment

The central dispute between the parties concerns the interpretation of the Lease Amendment, which is cited above. Both AWT and Chesapeake argue that the language in the provision is unambiguous as to whether the Lease Amendment prohibits Chesapeake from deducting the disputed capacity charges from AWT's royalties.

In Louisiana, mineral leases are construed as leases generally and, wherever pertinent, codal provisions applicable to ordinary leases are applied to mineral leases. See Musser Davis Land Co. v. Union Pacific Resources, 201 F.3d 561, 565 (5th Cir. 2000); Frey v. Amoco Production Co., 603 So. 2d 166, 171 (La. 1992); see also La. R.S. 31:2. Louisiana law provides that "[c]ontracts have the effect of law for the parties" and the "[i]nterpretation of a contract is the determination of the common intent of the parties." La. C.C. arts. 1983 and 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." Id. art. 2046. "When the language of a contract is clear and unambiguous, it must be interpreted solely by reference to the four corners of that document." Dickson v. Sklarco L.L.C., No. 11-0352, 2013 WL 1828051, at *3 (W.D. La. Apr. 29, 2013) (citing Tammariello Properties, Inc. v. Medical Realty Co., Inc., 549 So. 2d 1259, 1263 (La. App. 3d Cir. 1989)). Words of art and technical terms must be given their technical meaning

when the contract involves a technical matter, and words susceptible of different meanings are to be interpreted as having the meaning that best conforms to the object of the contract. See La. C.C. arts. 2047 and 2048. In Louisiana, "[p]arol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless there is ambiguity in the written expression of the parties' common intent." Blanchard v. Pan-OK Production Co., Inc., 32,764, p. 7 (La. App. 2d Cir. 4/5/00), 755 So. 2d 376, 381. "A contract is considered ambiguous on the issue of intent when it lacks a provision bearing on that issue or when the language used in the contract is uncertain or is fairly susceptible to more than one interpretation." Id. When a contract provision relating to mineral rights is ambiguous on a pivotal issue, the Louisiana Supreme Court and Courts of Appeal have interpreted the provision as having the meaning that best conforms to the object of the contract in light of the nature of the contract, equity, and usages, including extrinsic evidence as to custom and practices in the oil and gas industry. See Musser Davis Land Co. v. Union Pacific Resources, 201 F.3d 561, 565–67 (5th Cir. 2000); Henry v. Ballard & Cordell Corp., 418 So. 2d 1334, 1339–40 (La. 1982).

In the instant matter, AWT argues that the Lease Amendment clearly and expressly prohibits Chesapeake from deducting the capacity charges at issue from its royalties and points to certain language in the provision in support of its position. The key portions of the Lease Amendment that AWT relies on are those stating that Chesapeake "bears all costs of production, transportation, gathering, compression . . . <u>and any other cost, expense or preparation necessary</u> to produce, process and/or transport the [gas] . . . including any other costs and expenses that are incurred prior to delivery of the gas into a [pipeline]," as well as the portion providing that the only cost that can be charged against

AWT's royalties is "[AWT's] proportionate share of the long-haul transportation charges . . . once the gas is in a [p]ipeline." See Record Document 45-2 at 6 (emphasis added). AWT contends that this language is unambiguous in meaning that Chesapeake can only deduct from AWT's royalties its proportionate share of transportation charges that are incurred for the actual transport of AWT's gas "in a" transportation pipeline, not for any other costs or charges that Chesapeake may or may not incur if AWT's gas is not placed in a transportation pipeline and transported to its final point of sale. See Record Document 59 at 17–18.

Conversely, Chesapeake responds that the "actual[3] transportation costs" it incurs in transporting AWT's gas include both the commodity fee[4] and any capacity charges charged by a pipeline transporting the gas, which are actual costs necessary to move the gas to its final point of sale. Chesapeake also maintains that it does not violate the terms of the Lease Amendment when it charges AWT's royalties with its share of capacity charges because it only does so for periods in which AWT's gas is placed in a pipeline for transport to a downstream point of sale. See Record Document 57 at 1, 3. Furthermore, Chesapeake disputes AWT's contention that Chesapeake is required to prorate AWT's share of capacity charges based on the ratio of gas shipped to the total volume reserved, and that it is instead permitted to prorate these costs based on the percentage of AWT's gas to the total volume shipped. See id. at 4. Chesapeake argues

---

[3] The Court notes that while both parties make arguments as to the meaning of "actual transportation costs," this phrase is not mentioned or defined anywhere in the Lease Amendment. See Record Document 45-2 at 6.

[4] The commodity charge appears to be smaller than the capacity charges paid in these contracts and is associated with the cost the producer incurs for the transport of the gas itself. See Commissioner of General Land Office of State v. SandRidge Energy, Inc., 454 S.W.3d 603, 621 (Tex. App.–El Paso 2014); Record Document 47-1 at 7.

that this interpretation is consistent not only with the Lease Amendment itself but also the custom[5] in the oil and gas industry as to how such fees are charged by third-party transportation pipelines. See id. at 2, 4.

In this case, the Court finds that the Lease Amendment is ambiguous as to the issue of whether the disputed capacity charges are properly deductible from AWT's royalties. At the outset, the Court notes that the instant case is riddled with ambiguities, those of which are prevalent in the provisions of the Lease, the Lease Amendment, and the parties' inconsistent arguments as to their proper interpretation. As an initial starting point, there is no reference to the terms "capacity charge," "demand" or "commodity charge," or "reservation fee" in the Lease Amendment or the Lease itself; instead, the Lease Amendment only references "transportation charges." See Record Document 45-2 at 6. Likewise, the Court determines that the phrase "long-haul transportation charges" provided in the Lease Amendment is susceptible of more than one reasonable interpretation and thus is also ambiguous as to the issue of whether such phrase includes the disputed capacity charges, some portion of the charges, or none at all. Moreover, as further explained below, there is insufficient and contradictory evidence as to the exact nature of Chesapeake's arrangements with the third-party transportation pipelines involved in transporting AWT's gas, as well as the other Chesapeake entities involved in marketing and transporting the gas, such that the Court is unable to grant summary judgment for either party at this stage. In addition, a related issue further adding to the ambiguity of the Lease Amendment (and overall Lease itself) is the apparent conflict

---

[5] The Court notes that none of the parties have provided an affidavit from an expert as to the custom in the oil and gas industry regarding any of the issues in this case.

between the Lease Amendment and the "market value at the well" provision contained in the original Lease. This issue is further addressed below in Section II.C., infra.

The Court further notes that only a small number of cases have addressed the specific issue of capacity charges (i.e., firm transportation costs or reservation fees), the majority of which do not address the issue in depth, and none of which involved a lease provision sufficiently comparable to the disputed provision in this case to warrant a clear result for the Court to follow. In addition, none of the cases are Louisiana decisions and, therefore, are persuasive only and not binding on this Court. See, e.g., Frey v. Amoco Production Co., 603 So. 2d 166, 182 (La. 1992). Even so, both parties have presented arguments as to why these cases favor their respective interpretations of the Lease Amendment. The most relevant and factually similar of these cases is Commissioner of General Land Office of State v. SandRidge Energy, Inc., 454 S.W.3d 603 (Tex. App.–El Paso 2014), a somewhat recent Texas state court decision that involved a lease provision with similar language to the one at issue here. In that case, the parties disputed a provision in one of the leases that provided as follows:

> The royalties reserved by [Longfellow], and which shall be paid by [SandRidge], are . . . on gas . . . [sold by SandRidge] . . . one-eighth (l/8th) of the net proceeds derived from the sale thereof . . . remaining after deducting . . . all costs and expenses actually incurred by . . . [SandRidge in] . . . transporting . . . the gas so sold . . . .

See id. at 622 (emphasis in original). There, the parties acknowledged that transportation costs were properly deductible from the lessor's royalties under the lease, but they disagreed as to the proper allocation of certain "firm transportation charges." In its analysis of the issue, the court first noted that "[t]here is virtually no judicial authority discussing, much less meaningfully analyzing firm transportation charges." Id. at 621. The

court also stated that while the parties had cited to Independent Petroleum Ass'n of America v. DeWitt, 279 F.3d 1036 (D.C. Cir. 2002), an earlier decision that addressed firm transportation charges in the context of federal regulations, it was not applicable to its case because DeWitt did not involve a contractual dispute and thus was only useful for its general explanation of the charges. See SandRidge, 454 S.W.3d at 621 (citing DeWitt, 279 F.3d at 1036–42). In reversing the lower court's decision that allowed the lessee to deduct the entire demand (or capacity) charge at issue, the court held that any firm transportation charges that the lessee deducts from royalties "must directly correlate to the volumes of gas it produces, transports, and sells under the [l]eases," and that any charges "incurred for pipeline space that is not ultimately used are not 'actually incurred' in connection with the sale of gas produced." See id. at 622.

In this case, both parties argue that the SandRidge decision supports their respective positions as to whether the capacity charges in dispute here are properly deductible. Chesapeake contends that the way in which transportation costs (including any capacity charges) are deducted from AWT's royalties comports exactly with the court's holding in SandRidge, i.e., such costs are only deducted when AWT's gas is actually transported in a pipeline. See Record Document 57 at 4. Regardless of whether Chesapeake actually deducts such costs in the manner it describes, the Court is less clear as to AWT's claim on this issue, as well as the exact remedy AWT seeks from the Court. For example, AWT's position for the majority of this litigation has been its claim that Chesapeake violates the Lease Amendment when it deducts capacity charges from AWT's royalties whenever Chesapeake either (1) does not ship any amount of AWT's gas in a pipeline or (2) does ship some of AWT's gas in a pipeline but when less than

100% of the volume reserved is shipped. See Record Document 45-2 at 10; see also Record Document 59 at 16 (arguing that like the result in SandRidge, "Chesapeake is prohibited under the [] Lease Amendment terms from charging [AWT's] royalty for any capacity charges incurred by Chesapeake for Chesapeake's reservation of pipeline space that is not ultimately used in connection with the transportation of [AWT's] gas to a transportation pipeline").[6] In its most recent brief filed with the Court, however, AWT now appears to be arguing that whether or not these charges are classified as "transportation charges" under the Lease Amendment is "immaterial," and that Chesapeake is prohibited from deducting any capacity charges at all, even those incurred when AWT's gas is transported in a pipeline, on the sole basis of Chesapeake having allegedly incurred these charges prior to delivery of the gas into a pipeline. See Record Document 67 at 2–3. However, for several reasons discussed below, the Court finds that regardless of which argument AWT is pursuing, neither it nor Chesapeake has met its burden in showing the absence of a genuine dispute of material fact as to whether the capacity charges are properly deductible under the Lease.

First, neither party has provided sufficient summary judgment evidence as to the exact nature of both the contracts that Chesapeake enters into with the third-party transportation pipelines in order to transport AWT's gas, as well as the contracts between the multiple Chesapeake entities and their respective roles in this process. Although there

---

[6] The evidence is also inconsistent as to whether Chesapeake only deducts a proportionate amount of the charges from AWT's royalties when AWT's gas is shipped in a pipeline. See Record Document 57 at 1; see also Record Document 67 at 2 (disputing Chesapeake's claim that it mistakenly netted certain costs from AWT's royalties and claiming that such action was in fact a concealed attempt by Chesapeake to make improper deductions).

is some evidence in the record generally describing the process by which AWT's gas is transported from the wellhead to its eventual point of sale, see Record Document 47-2 at 2–4 (citing Affidavit of Deven Bowles, Exhibit 3), there are nevertheless numerous gaps and inconsistencies in the record regarding, *inter alia*, when, how, and by whom the capacity charges are incurred. Because the Court finds that these questions relate to factual issues that are "material" for purposes of summary judgment in this case, the granting of summary judgment for either party is not appropriate because there remain genuine disputes as to material facts that the Court cannot decide at this stage.

For example, while COLLC is the entity responsible for calculating and paying AWT's royalties, CEM is the entity that actually incurs the costs to transport AWT's gas, including any capacity charges, and "nets these costs in computing the proceeds it pays COLLC, on Lessees'[7] behalf." See id. at 3. Regarding the capacity charges specifically, Chesapeake explains that "CEM allocates the [capacity charges] back to producing wells based on the amount of gas produced from each well compared to the volume shipped." See id. This statement suggests that the process by which CEM allocates any capacity charges it incurs to COLLC, which are then considered in COLLC's computation of AWT's royalties, is not complete until after AWT's gas is shipped, since CEM bases its allocation of the charges "on the amount of AWT's gas produced from each well compared to the volume shipped." See id. (emphasis added). However, Chesapeake appears to contradict this statement when it cites to various other statements in the record in which it explains

---

[7] According to Chesapeake, the actual "Lessees" in this matter are Chesapeake Louisiana, L.P. ("CLLP") and Chesapeake Plains, L.L.C. ("CPLLC"). See Record Document 47-2 at 1. The Court notes that CPLLC is not named as a defendant with the other Chesapeake entities in AWT's Petition. See Record Document 1-2 at 10–11.

that the capacity charges are "charged regardless of whether 100% of the reserved volumes are shipped, since they are fixed costs that secure guaranteed, priority access." See Record Document 57 at 2. These other statements, if read alone, would seem to imply that the capacity charges are incurred "prior to delivery of the gas into a [pipeline]" and, thus, not deductible from AWT's royalties under the Lease Amendment. See Record Document 45-2 at 6. When read in context with the other statements provided above explaining how the capacity charges are incurred, the Court is left with a muddled understanding of how these charges are incurred and allocated when Chesapeake calculates AWT's royalties. Thus, even though AWT has not offered competent summary judgment evidence to rebut Chesapeake's assertion as to when it incurs the capacity charges, Chesapeake's inconclusive evidence is likewise insufficient to resolve the dispute for purposes of summary judgment.

    **C.    Whether AWT's Royalty Is Based on the Correct Point of Value**

Chesapeake also seeks summary judgment dismissing AWT's additional claim that Chesapeake has not been basing AWT's royalty on the correct point of value. Record Document 47-1 at 17. In Louisiana, the general rule is that when a mineral lease directs the lessee, in calculating the royalties owed to the lessor, to base the royalty payments on the "market value at the well," post-production costs are shared *pro rata* between the lessor and lessee unless the lease provides otherwise. See Merritt v. Southwestern Elec. Power Co., 499 So. 2d 210, 213 (La. App. 2d Cir. 1986). In other words, in order to determine the market value at the well under a lease with such a provision, the lessee "begin[s] with the gross proceeds from the sale of the gas and deduct[s] therefrom any additional costs of taking the gas from the wellhead (the point of production) to the point

of sale." See id. These post-production costs include certain processing and, *inter alia*, transportation costs incurred to market the gas to a downstream point of sale. See Babin v. First Energy Corp., 96-1232, p. 3 (La. App. 1st Cir. 3/27/97), 693 So. 2d 813, 815.

In this case, the original Lease provides that AWT's royalties, on gas "produced and sold or used off the premises," are based on the "market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale . . . ." See Record Document 47-3 at 9.[8] However, the Lease Amendment that was later entered into by the parties appears to conflict with the market value provision because it provides that Chesapeake shall bear all costs of producing the gas, in addition to other post-production costs, except for the "long-haul" transportation charges that AWT is to proportionately share. See Record Document 45-2 at 6. Because it is unclear as to what the parties intended regarding the exact scope of the Lease Amendment and its effect on the other provisions in the Lease, the Court finds that summary judgment is not appropriate as to this issue as well. Although there are several reasonable explanations as to what the parties intended, it is certainly not unambiguous as to the intended result. First, even assuming that the parties intended to alter the point of valuation by entering into the Lease Amendment, it is unclear as to

---

[8] The Court notes that Louisiana courts, when interpreting leases containing "market value at the well" provisions, distinguish between the "point of valuation" and the point of sale of the gas, a distinction explained by the Fifth Circuit in a case involving a lease with a nearly identical provision:

> The lease, quite plainly, thus makes separate provision for two main situations: first, where the gas in (1) "sold or used off the premises"; and second, where it is (2) "gas sold at the wells." On the latter (2), the royalty is the specified fraction of the amount actually received. But where the gas is (1) sold or used off the premises, it is the "market value at the well" of gas so sold or used.

Freeland v. Sun Oil Co., 277 F.2d 154, 157 (5th Cir. 1960).

what point of valuation the parties intended to be substituted in its place. The Court could plausibly reconcile the two provisions by concluding that the parties intended the "tailgate of the furthest downstream of either (i) a gathering system[] or (ii) a treating plant" to be the point of valuation. See id. However, this interpretation would require the Court to render the "market value at the well" provision superfluous[9] (even though the parties chose not to remove or alter this language when it amended the Lease), since Louisiana courts interpret "market value at the well" to mean that both parties share post-production costs, which would inherently include any costs that occur before the above-referenced "tailgate." See Merritt, 499 So. 2d at 213. Furthermore, it would be illogical for the Court to conclude that it is unambiguous as to how the market value provision is altered by the Lease Amendment when the Court has already concluded above that the exact scope and effect of the Lease Amendment itself is ambiguous.

This Court was previously confronted with issues similar to those in the present case in Magnolia Point Minerals, LLC v. Chesapeake Louisiana, LP, No. 11-0854, 2013 WL 3989579 (W.D. La. Aug. 2, 2013). There, an exhibit to the parties' lease agreement contained a broad "no cost" provision which provided that "no cost shall be charged or allocated to Lessor's interest except severance and other applicable taxes." See id. at *3. However, like the present case, the lease also contained a "market value at the well" provision, which the Court noted conflicted with the former provision. Because the Court found the "no cost" provision ambiguous as to its meaning and effect on the market value

---

[9] See KPW Associates v. S.S. Kresge Co., 535 So. 2d 1173, 1182–83 (La. App. 2d Cir. 1988) ("A cardinal rule in the construction of contracts is that the contract must be viewed as a whole and, if possible, practical effect given to all of its parts . . . so to avoid neutralizing or ignoring any of them or treating them as surplusage.") (emphasis added) (quoting Lambert v. Maryland Casualty Co., 418 So. 2d 553, 559–60 (La. 1983)).

provision, the Court denied summary judgment on the ground that extrinsic evidence was needed in order to determine the parties' intent. See id. at *5. Here, as in that case, the Court cannot determine the parties' intent from the Lease and Lease Amendment alone and thus summary judgment is premature at this stage.

### D. Claim for Penalties Under the Louisiana Mineral Code

Chesapeake also seeks summary judgment dismissing AWT's claim that AWT is entitled to penalties, or "double damages," under the Louisiana Mineral Code on the ground that Chesapeake willfully and intentionally failed to pay royalty payments due to AWT. See Record Document 47-1 at 18–19. Under Louisiana law, a mineral lessee, upon receiving a proper notice of failure to pay royalty payments, must respond within 30 days by either paying the royalty due or providing a reasonable cause for nonpayment. See La. R.S. 31:138. If a lessee violates these requirements, the court may in its discretion "award as damages double the amount of royalties." Id. 31:140. In addition, Louisiana courts generally disfavor such awards and consider the reasonableness of the lessee's conduct, including whether lessee acted fraudulently or willfully, as factors in deciding whether to grant such awards. See, e.g., Columbine II Ltd. Partnership v. Energen Resources Corp., 129 Fed. App'x 119, 123 (5th Cir. 2005) (citing Matthews v. Sun Exploration and Production Co., 521 So. 2d 1192, 1195–97 (La. App. 2d Cir. 1988)).

In this case, because the Court has already concluded that genuine disputes of material fact exist regarding the parties' intent under the Lease, the Court cannot at this stage determine whether or not Chesapeake's reasons for deducting the disputed costs from AWT's royalties were "unreasonable." Likewise, the record evidence is wholly insufficient as to whether Chesapeake "willfully and intentionally" failed to properly pay

royalty payments to AWT. Therefore, summary judgment is also premature regarding AWT's claim for penalties.

### E. Claim Against PXP

In addition to the motions filed by AWT and Chesapeake, the Court also addresses Defendant PXP's Motion for Summary Judgment in which it seeks dismissal of all of AWT's claims against it. PXP's primary contention is that it was not a party to the Lease Amendment entered into by AWT and Chesapeake and, therefore, it cannot be held liable to AWT for any of its claims and that AWT can only seek relief from Chesapeake. See Record Document 49 at 1–2. Under the Louisiana Mineral Code, both an assignee and a sublessee of a mineral lessee are directly responsible to a mineral lessor for the performance of the lessee's obligations. See Dickson v. Sklarco L.L.C., No. 11-0352, 2013 WL 1828051, at *5 (W.D. La. Apr. 29, 2013). Thus, in contrast to the articles governing assignees and sublessees under the Louisiana Civil Code, it is irrelevant under the Mineral Code whether the lessor has contractual privity with the sublessee because Mineral Code article 128 effectively creates statutory privity between them which enables the lessor to demand performance from either party. See La. R.S. 31:128; see also Hoover Tree Farm, L.L.C. v. Goodrich Petroleum Co., L.L.C., 46,153, pp. 11–12 (La. App. 2d Cir. 3/23/11), 63 So. 3d 159, 166–67.

In this case, the transaction between Chesapeake and PXP is properly classified as a sublease, since the Sublease shows that Chesapeake reserved to itself an overriding royalty interest in the Sublease agreement. See Record Document 64-1 at 1; see also Bond v. Midstates Oil Corp., 53 So. 2d 149, 154 (La. 1951) (stating that Louisiana courts have long held that the reservation of an overriding royalty interest is, in and of itself,

sufficient to "stamp the transfer as a sublease"). However, because the Mineral Code makes both assignees and sublessees directly liable to a mineral lessor for the lessee's obligations, the Court finds that AWT can seek to hold PXP liable for the same claims it brings against Chesapeake (the original lessee) regardless of whether PXP is classified as an assignee or sublessee of Chesapeake's interest in the Lease.

Furthermore, Chesapeake and PXP appear to have also entered into a separate "Participation Agreement" that, based on its express terms, provides that "Chesapeake will act as [the] lead leasing [p]arty" and single operator responsible for negotiating documents relating to their shared leasehold interest. See Record Document 58-1 at 34. An additional provision working against PXP's argument is the portion of the Lease Amendment that states that it "shall be binding upon and shall inure to the benefit of the respective heirs, successors, legal representatives, sublessees or assigns of the parties hereto." See Record Document 47-3 at 17 (emphasis added). Given that PXP has failed to provide sufficient evidence to rebut AWT's arguments based on these documents, or to support its claim that it did not intend to be bound by the Lease Amendment,[10] PXP has, at the very least, failed to show the absence of any genuine disputes of material fact in order to warrant summary judgment in its favor.

---

[10] Notwithstanding the express terms of the referenced Participation Agreement and Lease Amendment, PXP's lack of evidence in support of its argument that the Lease Amendment somehow constituted a new contract is also insufficient to rebut the general rule that novation "may not be presumed" and "must be clear and unequivocal." See La. C.C. art. 1880; see also La. C.C. art. 2726 ("An amendment to a provision of the lease contract that is made without an intent to effect a novation does not create a new lease.").

**III. CONCLUSION**

The Court finds that the ambiguity contained in both the Lease and the Lease Amendment prevents summary judgment at this stage. Thus, based on the foregoing reasons, both AWT's Motion for Partial Summary Judgment (Record Document 45) and Chesapeake's Motion for Summary Judgment (Record Document 47) are **DENIED**. Additionally, PXP's Motion for Summary Judgment (Record Document 49) is **DENIED**.

An order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, on this 11th day of January, 2019.

_____
S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT